PORTAGE REALTY CORPORATION v BAAS

Docket No. 43646. Submitted December 4, 1979, at Grand Rapids.—
Decided September 16, 1980.

In March and April of 1974, John Baas contacted Lewis Weaver, a salesman for Portage Realty Corporation (Portage), to discuss the possible construction of several houses, which he intended to resell at a profit. On April 8, 1974, while negotiations with Weaver continued, Baas entered into an agreement with Ford Realty to purchase three vacant lots. On May 16, 1974, Baas purchased a fourth lot from Ford Realty. Both purchase agreements stated that John Baas alone was the purchaser of the property. On May 29, 1974, Baas executed several agreements with Portage for the construction of houses on the four lots which he was in the process of purchasing. The contracts were written on preprinted forms supplied by Portage and were signed by John Baas as "owner" of the properties. Construction under the contracts was to begin within 14 days from receipt of a letter from the lending institution acknowledging the signing of a mortgage note. Preliminary soil samples were included as part of the contract work to be undertaken by Portage. Baas paid $200 as an initial deposit for each lot. When the agreements were signed, Portage gave Baas copies of the contracts and general construction plans and specifications, which he submitted to the First National Bank of South Central Michigan to examine for his loan application. On June 13, 1974, Robert Prestine, a licensed surveyor employed by Portage, completed a topological survey on the four vacant lots. The tests included: soil borings, which required digging a hole three inches in diameter and seven feet deep; percolation tests, which required digging another hole, six inches in diameter and two feet deep; and other tests to determine the elevation of the ground. The results of these tests were submitted to Portage on June 15, 1974. On June 19, 1974, Weaver, the salesman at

REFERENCES FOR POINTS IN HEADNOTES

[1] 53 Am Jur 2d, Mechanics' Liens § 41.
[2] 53 Am Jur 2d, Mechanics' Liens § 247 *et seq.*
[3] 53 Am Jur 2d, Mechanics' Liens § 112.
[4, 5] 53 Am Jur 2d, Mechanics' Liens § 263 *et seq.*

Portage who had dealt with Baas, telephoned Daniel Ward, an officer at First National Bank, to discuss the financing of the construction project. Weaver did not mention Prestine's topographical surveys. Ward told Weaver that the Baas loan was approved, that a mortgage agreement would be concluded within two weeks and a commitment letter to this effect would be sent to Portage. On June 20 and June 21, 1974, the four lots were deeded to John Baas and his wife Dorcas, as tenants by the entireties. The deeds were recorded with the Register of Deeds on those same dates. A copy of these deeds were mailed to Portage. On July 1, 1974, Portage delivered blueprints of the final construction plans for each lot to Baas. The plans also contained the topographical data which had been obtained from Prestine's surveys. On July 9, 1974, Mr. and Mrs. Baas executed mortgages on the four parcels of land to the defendant First National Bank in the amount of $20,000 each for three houses and $25,000 for the other. Ward, the bank officer, sent Portage a letter informing Portage of the loans "for Mr. John J. Baas". The mortgages were recorded on July 11, 1974. On July 13, 1974, Weaver notified his home office that, at John Baas's request, the construction payments would be made by him rather than by the bank. The bank had deposited the mortgage funds into the John J. Baas Trust Account, which could be withdrawn at any time by either John or Dorcas Baas. On July 30, 1974, Robert Prestine staked the properties. Excavation work commenced on July 31, 1974. The construction work was performed as scheduled in the agreements, but payments by Baas did not follow the periodic draw requests. Although all of the moneys were withdrawn from the trust account, the funds were not used to pay Portage. Portage did pay all of its suppliers and employees in full according to the prearranged schedule. Portage did not make any inquiry of the bank concerning the nonpayment of its draws until November 25, 1974, when all of the money had already been withdrawn from the trust account. On December 6, 1974, when construction was completed, Portage was owed $50,186.

Four mechanic's liens were filed on January 27, 1975, and the requisite notices were posted. Portage filed suit against John and Dorcas Baas and First National Bank of South Central Michigan in the Branch Circuit Court for foreclosure of the mechanic's liens, sale of the properties and distribution of the proceeds. The trial court, Harvey W. Moes, J., determined that the mechanic's liens did not have priority over the mortgages. The trial court found that there was no express or implied agreement by the bank to assure that Mr. and Mrs.

Baas would make the construction progress payment. Furthermore, the trial court stated that the topographical tests did not constitute a "commencement" within the meaning of the mechanic's lien statute, since the bank had no visible notice that construction had begun. Alternatively, the trial court determined that a valid lien could not attach to these properties because the contracts had been signed by John Baas alone, and the title to the property was held by John and Dorcas Baas. The trial court found that Portage was derelict in failing to determine who held title to the property but entered a judgment of $50,186 for Portage against Mr. and Mrs. Baas. Portage appeals that portion of the trial court's decision which pertains to its mechanic's liens. *Held:*

1. At the time of signing the contract with Portage, Mr. Baas had an equitable interest in the properties. The owner of an equitable interest in land holds a property interest to which a mechanic's lien may attach. The mechanic's lien statute provides that the lien attach to the right, title and interest of the contracting party in the land at the time work was commenced, equipment leased or materials begun to be furnished. Engineering services are within the scope of the statute. Therefore the liens are valid.

2. The performance of engineering services for the construction of a building is not a "commencement" of an improvement sufficient to give mechanic's lien priority over a mortgage which was recorded before there was any visible construction of the building. Whether a mortgagee had actual notice of engineering services being performed for the construction of a building before it recorded the mortgage is not relevant to determining the priorities between the mortgage and mechanic's liens on the property. The issue is when "commencement" of the building or improvement occurred. Therefore, the mortgages have priority over the mechanic's liens.

Affirmed.

1. MECHANICS' LIENS — REAL PROPERTY — EQUITABLE INTERESTS.

   The owner of an equitable interest in land holds a property interest to which a mechanics' lien may attach.

2. MECHANICS' LIENS — ATTACHMENT — REAL PROPERTY — STATUTES.

   The mechanics' lien statute provides that a lien will attach to the right, title and interest of the contracting party in the land at the time work was commenced, equipment leased or materials begun to be furnished (MCL 570.1; MSA 21.281).

3. MECHANICS' LIENS — SCOPE OF LEGISLATION — ENGINEERING SER-
   VICES — STATUTES.

   The mechanics' lien statute includes the providing of engineering
   services within its scope (MCL 570.1; MSA 26.281).

4. MECHANICS' LIENS — PRIORITY — COMMENCEMENT OF IMPROVEMENT
   — ENGINEERS — STATUTES.

   The performance of engineering services for the construction of a
   building is not a "commencement" of an improvement suffi-
   cient to give mechanics' lien priority over a mortgage which
   was recorded before there was any visible construction of the
   building; the mere fact that the mechanics' lien statute has
   been amended so that the engineering work is the proper
   subject of a lien cannot establish priority when the work does
   not give visible notice of the commencement (MCL 570.8; MSA
   26.289).

5. MECHANICS' LIENS — PRIORITY — COMMENCEMENT OF IMPROVEMENT
   — ENGINEERS — MORTGAGES — STATUTES.

   Whether a mortgagee had actual notice of engineering services
   being performed for the construction of a building before it
   recorded the mortgage is not relevant to determining the
   priorities between the mortgage and mechanics' liens on the
   property; the issue is when "commencement" of the building or
   improvement occurred (MCL 570.9; MSA 26.289).

*Brown, Colman & DeMent, P.C.* (by *Robert W. Ionta),* for plaintiff.

*Dresser, Marks & Svendsen,* for defendant First National Bank of South Central Michigan.

Before: BRONSON, P.J., and ALLEN and R. M. MAHER, JJ.

PER CURIAM. This appeal was brought to resolve a dispute concerning the priority of a mechanics' lien over a subsequent mortgage.

In March and April of 1974, John Baas con-
tacted Lewis Weaver, a salesman for Portage
Realty Corporation (hereinafter Portage), and dis-
cussed the possible construction of several houses,
which he intended to resell at a profit. On April 8,

1974, while negotiations with Weaver continued, Mr. Baas entered into an agreement with a salesman from Ford Realty to purchase three vacant lots located on Loves Shore Drive, Algansee Township, Michigan. On May 16, 1974, Baas purchased a fourth lot from Ford Realty, this one located in Hallwood Estates, Coldwater, Michigan. Both purchase agreements stated that John Baas alone was the purchaser of the property. ·

On May 29, 1974, John Baas executed several agreements with Portage for the construction of houses on the four lots which he was in the process of purchasing. The contracts were written on preprinted forms supplied by Portage and were signed by John Baas as "owner" of the properties. Construction under the contracts was to begin within 14 days from receipt of a letter from the lending institution acknowledging the signing of a mortgage note. Preliminary soil samples were included as part of the contract work to be undertaken by Portage. Mr. Baas paid $200 as an initial deposit for each lot. When the agreements were signed, Portage gave Baas copies of the contracts and general construction plans and specifications, which he submitted to the First National Bank of South Central Michigan to examine for his loan application.

On June 13, 1974, Robert Prestine, a licensed surveyor employed by Portage, completed a topological survey on the four vacant lots. The tests included: soil borings, which required digging a hole three inches in diameter and seven feet deep; percolation tests, which required digging another hole, six inches in diameter and two feet deep; and other tests to determine the elevation of the ground. The results of these tests were submitted to Portage on June 15, 1974. Portage paid Prestine in full for this work.

On June 19, 1974, Weaver, the salesman at Portage who had dealt with Baas, telephoned Daniel Ward, an officer at First National Bank, to discuss the financing of the construction project. Weaver did not mention Prestine's topological surveys. Ward told Weaver that the Baas loan was approved, that a mortgage agreement would be concluded within two weeks, and a commitment letter to this effect would be sent to Portage.

On June 20 and June 21, 1974, the four lots were deeded to John Baas and his wife Dorcas, as tenants by the entireties. The deeds were recorded with the Register of Deeds on those same dates. A copy of these deeds were mailed to Portage.

On July 1, 1974, Portage delivered blueprints of the final construction plans for each lot to Mr. Baas. The plans also contained the topographical data which had been obtained from Prestine's surveys.

On July 9, 1974, Mr. and Mrs. Baas executed mortgages on the four parcels of land to the defendant First National Bank in the amount of $20,000 each for the three houses on Loves Shores and $25,000 for the house on Hallwood Estates. Ward, the bank officer, sent Portage a letter informing Portage of the loans "for Mr. John J. Baas". The mortgages were recorded on July 11, 1974.

On July 13, 1974, Weaver notified his home office that, at John Baas's request, the construction payments would be made by him rather than by the bank. The defendant bank had deposited the mortgage funds into the John J. Baas Trust Account, which could be withdrawn at any time by either John or Dorcas Baas.

On July 30, 1974, Robert Prestine staked the properties. Excavation work commenced on July 31, 1974. The construction work was performed as

scheduled in the agreements, but payments by Baas did not follow the periodic draw requests. Although all of the moneys were withdrawn from the trust account, the funds were not used to pay Portage. Portage did pay all of its suppliers and employees in full according to the prearranged schedule. Portage did not made any inquiry of the defendant bank concerning the nonpayment of its draws until November 25, 1974, when all of the money had already been withdrawn from the trust account. On December 6, 1974, when construction was completed, Portage was owed $50,186. Four mechanics' liens were filed on January 27, 1975, and the requisite notices were posted.

The bank later sold the properties and discharged the mortgages on August 25, 1975, September 15, 1975, September 22, 1975, and December 24, 1975. The money was placed in an escrow account due to the pending lawsuit.

A trial was held before the Branch County Circuit Court in August of 1976. In a decision issued on June 21, 1978, the trial court determined that the mechanics' liens did not have priority over the mortgages. The trial court found that there was no express or implied agreement by the bank to assure that Mr. and Mrs. Baas would make the construction progress payment. Furthermore, the trial court stated that the topographical tests did not constitute a "commencement" within the meaning of the mechanics' lien statute, since the bank had no visible notice that construction had begun. Alternatively, the trial court determined that a valid lien could not attach to these properties because the contracts had been signed by John Bass alone, and the title to the property was held by John and Dorcas Baas. The trial court found that Portage was derelict in failing to deter-

mine who held title to the property. The trial court did enter a judgment of $50,186 for Portage against Mr. and Mrs. Baas. Portage now appeals that portion of the trial court's decision which pertains to its mechanics' liens.

The first issue we consider on appeal is whether the mechanics' liens could attach to the entireties property where only the husband had signed the construction contracts.

Michigan's mechanics' lien statute contains the following provision dealing with land held by the entireties, MCL 570.2; MSA 26.282:

"Sec. 2. In case the title to such lands upon which improvements are made is held by husband and wife jointly, or in case the lands upon which such improvements are made are held and occupied as a homestead, the lien given by this act shall attach to such lands and improvements if the improvements be made in pursuance of a contract in writing signed by both the husband and wife."

Apparently, the purpose of this provision is to protect the nonsigning spouse from a debt to which he or she did not agree, and indeed, of whose existence he or she may be completely unaware. See *Wallich Lumber Co v Golds,* 375 Mich 323, 328; 134 NW2d 722 (1965).

However, at the time that John Baas signed the construction agreements with Portage, the property was not yet owned by John and Dorcas as tenants by the entireties. Indeed, John Baas alone had an equitable interest in these lots. The owner of an equitable interest in land holds a property interest to which a lien may attach. *Wyoming Park Lumber & Fuel Co v Vander Ark,* 291 Mich 496, 501; 289 NW 228 (1939).

In *Leverenz Lumber & Building Co v Rickels,*

251 Mich 57; 231 NW 112 (1930), Mr. Hoppe signed a construction agreement with a building contractor. Several days later, the land was bought and deeded to Hoppe and his wife, but this deed was not recorded. The materials and labor were supplied subsequent to execution of the deed. The Court upheld the validity of the mechanics' lien, saying that the lien claimants had a right to rely on the title as it stood at the time the construction contract was signed, absent actual or constructive knowledge that title to the property had been taken by the entireties. The Court said that to hold otherwise would allow a dishonest owner to avoid the lien by signing a contract and thereafter conveying the property to himself and his wife and withholding the deed from record.

In *Lewis Manufacturing Co v Lee,* 268 Mich 383; 256 NW 457 (1934), the sole vendee under a land contract signed an agreement to purchase construction materials prior to the execution and recording of the deed to the vendee and his wife. The Court found that the contractor's liens were valid, although his claim was refused for failure to comply with the notice requirement of the statutes.

The appellee would distinguish these cases because Portage had actual knowledge that title to the property was by the entireties, having received a copy of the deeds. However, under *Leverenz, supra,* this would only be true if no work had been done until after title had changed.

On May 29, 1974, when Mr. Baas signed the contracts with Portage, he had the sole interest in the property. The deeds which passed an interest to John and Drocas were not executed until June 20 and 21, 1974. Certainly, this change of ownership could not defeat any claim if work had com-

menced prior to June 20, otherwise the contractor, laborers, and materialmen would be required to periodically check on the status of the title and obtain new contracts each time. We do not think this was contemplated by the mechanics' lien statute, which at MCL 570.1; MSA 26.281 allows a lien to attach "to the extent of the right, title and interest of such owner, part owner or lessee at the time work was commenced, equipment leased or materials were begun to be furnished by the contractor under the original contract."

In order to resolve this issue, therefore, we must determine whether work had "commenced" prior to the time that the deed was executed.

In *Spartan Asphalt Paving Co v Grand Ledge Mobile Home Park,* 400 Mich 184, 188-189; 253 NW2d 646 (1977), the Supreme Court rejected prior restrictive interpretations of the mechanics' lien law and stated that this was a remedial statute designed to protect those who furnish labor and materials in connection with the improvement of land, and must therefore be liberally construed.

Section 1 of the mechanics' lien act, MCL 570.1; MSA 26.281, includes engineering services within its scope. Portage performed engineering services in the form of soil samples and topological surveys prior to the time that Mr. and Mrs. Baas acquired title to the land by the entireties. Therefore, we find that the mechanics' liens in favor of Portage were valid and had attached to the property.

The next issue for our determination is whether the mechanics' liens had priority over the mortgage in favor of First National Bank.

Under the Supreme Court's recent pronouncement in *Williams & Works, Inc v Springfield Corp,* 408 Mich 732; 293 NW2d 304 (1980), the priority provision of the mechanics' lien act, MCL 570.9;

MSA 26.289, was unchanged by amendments to § 1 of the act, which were revised to include the furnishing of engineering services as lienable work. The relevant portion of MCL 570.9; MSA 26.289 provides:

"Third, They [mechanics' liens] shall be preferred to all other titles, liens or incumbrances which may attach to or upon such building, machinery, structure or improvement, or to or upon the land upon which they are situated, which shall either be given or recorded subsequent to the commencement of said building or buildings, erection, structure or improvement."

The Court held that in order to take precedence in a priority dispute, the mechanics' lien must be based on some visible, on-site activity which occurred prior to execution of the mortgage instrument.

Furthermore, the Supreme Court said that the mortgage lender's actual knowledge of, or even its utilization of, any off-site or nonvisible engineering services or plans which were performed prior to the giving of the mortgage would not alter the result vis-a-vis commencement. Thus, the fact that First National had a copy of the contracts which Baas had signed with Portage and which clearly provided for soil testing and other engineering services does not constitute a waiver or estoppel on the part of the bank.

Affirmed. Costs to defendants.